**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 94-60178

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARY SCURLOCK,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Mississippi

(May 8, 1995)

Before WISDOM, JONES, and EMILIO M. GARZA, Circuit Judges.

WISDOM, Circuit Judge.

Mary Scurlock, the defendant/appellant, was convicted by a jury on two counts of mail fraud and acquitted of a charge of conspiracy to commit mail fraud by participating in a scheme to commit money order fraud. Her conviction is the result of her involvement in an altered money order scheme organized by an inmate at Parchman Penitentiary, Mississippi, where Scurlock was employed as a guard. Scurlock seeks review of the denial of her motion to suppress a confession, the admission of documents she contends were not properly authenticated, and her sentence. We AFFIRM her conviction but VACATE her sentence and REMAND for resentencing.

I.

In April of 1993, a grand jury for the Northern District of Mississippi indicted Mary Scurlock and other defendants of conspiracy to commit mail fraud by participating in a scheme to commit money order fraud. Scurlock was also charged with two substantive counts of mail fraud. Scurlock, employed as a prison guard at Parchman Penitentiary, was accused of assisting an inmate, Porter Shorter, in his money order scheme. Shorter would contact his victims through personal advertisements in "lonely hearts type magazines"[1] and try to gain their trust with the promise of a relationship. Then, Shorter would send his victims altered money orders, with an apparent value of $700 but a true value of only $1. The victims would deposit the money orders, return the funds to Shorter, and become liable for the difference between the apparent value of the money orders and their true value. Scurlock allegedly became involved in the plan in 1992 when Shorter became nervous about his wife smuggling the illegal proceeds to him at the prison. According to evidence presented by the government, Scurlock received two Express Mail packages at her personal post office box sent by Shorter's wife. The packages contained approximately

---

[1] Indictment, Count 1, paragraph 2 appearing in the Record, volume 1 at 2. Unfortunately, Parchman Penitentiary has a long history of inmates successfully perpetrating the same type of altered money order scheme. See e.g., *United States v. Jackie Brown*, 7 F.3d 1155 (5th Cir. 1995) (the appeal of a former contract food manager at Parchman convicted for conspiracy to alter and pass altered postal money orders and mail fraud); *United States v. Leroy Brown*, 941 F.2d 1300 (5th Cir. 1991) (affirming the conviction and sentence of a former Parchman correctional case manager who was convicted of possessing heroin with the intent to distribute it to prisoners and also accused of aiding in an altered money order scam).

$1,200 of illegal profits which Scurlock delivered to Shorter. Scurlock allegedly received $25 to $30 per package for her services.

During the investigation of this scheme, two U.S. Postal Inspectors, Agent Cooper and Agent McCarran, interrogated Scurlock about her involvement. During a work day, Scurlock was asked to meet investigators at the prison's Internal Affairs Office. The defendant arrived at the office in her own vehicle at about 3:50 p.m. At that meeting, the Postal Inspectors had in their possession evidence that Scurlock had received and signed for two packages mailed by Shorter's wife. After Scurlock initially denied any involvement, the investigators told her they believed she was involved and read the defendant her *Miranda* warnings. Scurlock signed a "Warning and Waiver of Rights" at 4:06 p.m.[2]

The investigators continued their interrogation and

---

[2] The first section of the "Warning and Waver of Rights" detailed Scurlock's right to remain silent and her right to an attorney. The document also stated:

> [i]f you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Scurlock signed and dated the document immediately below the quoted sentences. The waiver section of the document, which Scurlock also signed and dated, stated:

> I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Scurlock admitted that she had received packages on behalf of Shorter containing cash which she delivered to Shorter at the prison. The investigators prepared a summary of Scurlock's statement but also had Scurlock repeat her basic confession on tape. According to Scurlock, before her statement was recorded she invoked her right to counsel when, while waiting for Agent McCarran to retrieve the tape recorder, she told Agent Cooper that she needed a lawyer.[3]

According to the testimony of the investigators, at the end of the interview, Scurlock asked what would happen to her. The investigators replied by citing the case of another guard convicted on similar charges who received only six months in prison. The investigators contrasted that case with the case of another guard who did not cooperate and was expected to receive a longer sentence. According to Scurlock, this exchange occurred before she admitted involvement in the scheme and the investigators' comments regarding a six month sentence represented an implied promise which rendered her subsequent confession involuntary.

Before trial the defendant made a motion to suppress her statements to the investigators alleging that the confession was involuntary and that the recorded statement was obtained after she

---

[3] The full exchange, according to Scurlock's testimony at the suppression hearing, was that Agent Cooper told her that she would be indicted for her participation in the scheme. Scurlock's response was that she needed a lawyer. Agent Cooper then gave Scurlock the district attorney's business card and suggested that once Scurlock employed a lawyer, he or she should contact the district attorney listed on the card. Her recorded confession was taped after this exchange. Record, volume 2 at 55-65.

had invoked her right to counsel in violation of *Miranda*. The trial court denied this motion. After a one week trial, the jury found Scurlock not guilty on the count of conspiracy but guilty on the two counts of mail fraud. The defendant was sentenced to 24 months in prison. The sentence was based on a determined loss of value of $10,186 and increases for more than minimal planning, abuse of a position of trust, and a finding that the victims were vulnerable. The defendant now appeals both the conviction and sentence.

II.

## A.    Admissibility of Confession

The defendant argues that her incriminating statements to the Postal Inspectors investigating the scheme were involuntary because of the agents' comments to her regarding the sentence she could expect to receive. Specifically, Scurlock alleges that the agents made an implied promise of a six month sentence if she confessed and threatened her with a longer sentence if she refused to cooperate. The government, in response, argues that the discussion regarding sentences occurred after Scurlock's statements and could not, therefore, have had any impact on her decision to cooperate. Even assuming the chronology of events occurred as the defendant testified, the government argues that the agents simply responded to Scurlock's questions by citing examples of sentences that other similarly situated guards had received but that no promises or threats were made.

5

The trial court held a hearing on the defendant's motion to suppress at which both Postal Inspectors and the defendant testified regarding the interrogation at the Internal Affairs Office. The trial court concluded in its factual findings that the exchange regarding the sentence Scurlock could expect took place after the interrogation was completed. Further, the trial court determined that the agents discussed the possible sentence but "carefully avoided any promises of leniency to Ms. Scurlock".[4] On appeal, we must accept the findings of fact of the trial court unless we find that they are clearly erroneous.[5] The ultimate question of voluntariness is a legal question which we review *de novo*.[6]

A confession is voluntary if, "under the totality of the circumstances, the statement is the product of the accused's free and rational choice".[7] To be considered voluntary, a confession cannot be the product of "official overreaching, in the form either of direct coercion or subtle forms of psychological persuasion".[8] The government carries the initial burden of showing by a

---

[4] Order denying the defendant's motion to suppress at 3. See, Record, volume 2 at 63.

[5] *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1346-47 (5th Cir.), cert. denied, 114 S.Ct. 2713 (1994), 115 S.Ct. 103 (1994); *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir. 1993).

[6] *Restrepo*, 994 F.2d at 183.

[7] Id. at 183. (citations omitted).

[8] *United States v. Rojas-Martinez*, 968 F.2d 415, 418 (5th Cir. 1992), cert. denied, 113 S.Ct. 828 (1992), 113 S.Ct. 995 (1993). (citations omitted).

preponderance of the evidence that the defendant waived her rights and that the statements she made were voluntary.[9]

In this case, after hearing the testimony of Scurlock and the two investigators, the trial court determined that the conversation between Scurlock and the investigators regarding an expected sentence occurred after Scurlock admitted involvement in the mail order scheme. Thus, any implied promise could not have affected Scurlock's decision to cooperate. We find that the district court's decision to credit the testimony of the government witnesses over the defendant was not clearly erroneous. Further, even if the order of events were reversed, "a truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will".[10] This Court concludes that the district court did not err in finding that Scurlock's confession was voluntary.

Scurlock also challenges the admissibility of the taped version of her statement because she alleges that before that recording was made, she invoked her right to counsel and questioning should have stopped. The full exchange, according to Scurlock's testimony at the suppression hearing, was that Agent Cooper told her that she would be indicted for her participation in the scheme. Scurlock's response was that she needed a lawyer. Agent Cooper then gave Scurlock the district attorney's business

---

[9] *Restrepo*, 994 F.2d at 183.

[10] *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978); see also, *Hawkins v. Lynaugh*, 844 F.2d 1132, 1139-41 (5th Cir.), cert. denied, 488 U.S. 900 (1988).

card and suggested that once Scurlock employed a lawyer, he or she should contact the district attorney listed on the card. Her recorded confession was taped after this exchange. The government responds by arguing that Scurlock was not in custody at the time of the interview and that she did not invoke her right to counsel at any time.

Scurlock is correct when she asserts that if, after waiving the right to counsel, an accused invokes the right to have counsel present during further questioning, all questioning must cease.[11] The Supreme Court has recently held, however, that the right to counsel must be clearly invoked by the accused.[12] That is, if a suspect who is the subject of questioning makes an ambiguous comment from which a reasonable police officer "would have understood only that the suspect might be invoking the right to counsel, our precedents do not require cessation of questioning".[13] Further, the investigator conducting the questioning has no obligation to attempt to clarify the ambiguous comment of the accused.[14] Thus, "after a knowing and voluntary waiver of the

---

[11] *Edwards v. Arizona*, 451 U.S. 477, 485-86 (1981); see also, *Griffin v. Lynaugh*, 823 F.2d 856 (5th Cir. 1987), cert. denied, 484 U.S. 1079 (1988); *United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984), cert. denied, 470 U.S. 1058 (1985).

[12] *Davis v. United States*, 114 S.Ct. 2350, 2355 (1994).

[13] Id.

[14] Id. at 2356 (noting that clarifying questions after an ambiguous comment by the accused regarding counsel may be good police practice but refusing to "adopt a rule requiring officers to ask clarifying questions").

*Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney".[15]

In this case, the defendant signed a waiver which detailed her ability to invoke her right to counsel at any time and end the questioning. The comment Scurlock made regarding an attorney was after she admitted involvement in the scheme and after she had agreed to give a recorded statement. Scurlock's reference to an attorney was made in response to an agent's comment that she would be indicted in the future. Further, after taping began but before the agents questioned Scurlock regarding her involvement, the agents once again asked her if she was willing to answer their questions.

In these circumstances, Agent Cooper was reasonable in his conclusions that Scurlock had not changed her mind about cooperating with their investigation or about recording her statement. Rather, Scurlock's comment, in context, could reasonably be understood to be a recognition by the defendant of her need for an attorney in the future if the case reached the indictment stage. Since Scurlock did not clearly invoke her right to counsel, as required, the district court did not err when it denied the defendant's motion to suppress.

## B.  Inconsistent Verdicts

Scurlock also challenges the district court's denial of her post-verdict motion for a judgment of acquittal. The defendant

---

[15]  <u>Id.</u>

argues that since she was acquitted of the conspiracy charge (count 1), she necessarily could not be found guilty on the substantive charges of mail fraud (counts 4 and 6). The elements of mail fraud are participating in a scheme to defraud and causing the mails to be used for purposes of executing the scheme.[16] Essentially, Scurlock alleges that since, according to the jury, she did not join the conspiracy, she necessarily cannot be found to have participated in a scheme to defraud.

Although Scurlock contends that she is not challenging the jury verdict because of its inconsistency, we see no other way to characterize her this argument. Scurlock contends that if she is not guilty of conspiracy, she cannot be guilty of mail fraud since one element of mail fraud is participating in a scheme to defraud. The target of this allegation is the inconsistency of the jury's decision that Scurlock did not join the conspiracy but did, according to the elements of mail fraud, participate in a scheme to defraud. This argument must fail.

A jury can render inconsistent verdicts, "even where the inconsistency is the result of mistake or compromise".[17] And, contrary to the conclusions of the defendant, an acquittal on the conspiracy charge "does not necessarily equate with a finding that

---

[16] *United States v. Duncan*, 919 F.2d 981 (5th Cir. 1990), <u>cert. denied</u>, 500 U.S. 926 (1991).

[17] *United States v. Williams*, 998 F.2d 258, 262 (5th Cir. 1993), <u>cert. denied</u>, 114 S.Ct. 940 (1994). (citations omitted).

the defendant was innocent".[18]  The jury's verdict may have been motivated by other considerations.  The Supreme Court remarked on this issue in *United States v. Powell*:

> . . . [t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.[19]

Thus, the jury's acquittal of Scurlock on the conspiracy charge does not require reversal of her conviction on the substantive counts of mail fraud.

## C.    The Indictment

Scurlock also alleges a defect in the indictment.  She contends that the indictment itself made the conspiracy charge an element of the mail fraud counts alleged in counts 4 and 6.  In alleging the first element of mail fraud, participation in a scheme to defraud, the government referred back to the description of the mail order scheme in count 1, the conspiracy charge.  Scurlock argues that, with this reference, the government made the conspiracy charge an element of the substantive counts of mail fraud.

This argument lacks merit.  The government, in paragraphs 2 through 6 of count 1 of the indictment, described the basic

---

[18]    *United States v, Straach*, 987 F.2d 232, 241 (5th Cir. 1993).

[19]    469 U.S. 57 (1981).

11

workings of the altered money order scheme.  In counts 4 and 6, the two counts of mail fraud against Scurlock, the government incorporated by reference the factual description set forth in count 1.  The incorporation of material from count 1 did not include the paragraphs of count 1 which alleged the conspiratorial conduct.

Scurlock argues that the allegations of a conspiracy were incorporated and became an essential element of the counts of mail fraud.  This inaccurately characterizes the content of the indictment.  Under Federal Rule of Criminal Procedure 7(c)(1), the government is allowed to incorporate material by reference.  In this case, the government chose to refer to any earlier factual description rather than repeat it.  This reference did not create a defect in the indictment.


D.   **Admissibility of unauthenticated documents**

Scurlock also contends that the trial court erroneously admitted documentary evidence which was not properly authenticated as required by Federal Rule of Evidence 901.  The documents at issue are letters sent by or to various co-conspirators which detail different elements of the altered money order scheme.  One set of letters, apparently authored by Porter Shorter, was seized by Postal Inspectors in the home of another co-conspirator, Jessie Shorter.  The remaining two sets of letters were delivered to the Postal Inspectors by two alleged co-conspirators, Theretha Woods and Peggy Bozeman.  At trial, the government relied on the

12

testimony of an investigator regarding when and where the documents were seized and by whom the other letters were delivered to authenticate the documents.

Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponents claim". We review the district court's decision to admit the evidence for abuse of discretion.[20]

Conclusive proof of authenticity is not required.[21] "Use of circumstantial evidence alone to authenticate a document does not constitute error. . . . Fed.R.Evid. 901(a) requires only some competent evidence in the record to support authentication".[22] The government can also rely on the contents of the letter to establish the identity of the declarant.[23] And, "the fact that no handwriting analysis was done is not a bar to . . . admission".[24] Here, a Postal Inspector testified as to the circumstances under which the letters were seized from or delivered by members of the conspiracy.

---

[20] *United States v. Dockins*, 986 F.2d 888, 895 (5th Cir.), cert. denied, 114 S.Ct. 149 (1993).

[21] *United States v. Wake*, 948 F.2d 1422, 1434 (5th Cir. 1991), cert. denied, 112 S.Ct. 2944 (1992); *United States v. Singh*, 922 F.2d 1169, 1174 (5th Cir.), cert. denied, 500 U.S. 938 (1991).

[22] *Wake*, 948 F.2d at 1434 (quoting *United States v. Elkins*, 885 F.d 775 (11th Cir. 1989)).

[23] *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993); *Wake*, 948 F.2d at 1434.

[24] *Wake*, 948 F.2d at 1435 (quoting *United States v. Calbas*, 821 F.2d 887 (2d Cir. 1987)).

Furthermore, most of the letters themselves are addressed to or signed by co-conspirators.  The jury was free to decide what weight it would give the evidence.[25]  Under these circumstances, we find no abuse of discretion in the district court's decision to admit the letters into evidence.


**E.    Sentencing**

Under the Sentencing Guidelines the base offense level for mail fraud is six.  In Scurlock's case, this was increased by three levels after a finding that the amount of loss was over $10,000.  The defendant's offense level was also increased by a total of six because the trial court found that Scurlock abused a position of public trust, more than minimal planning was involved, and the targets of the scheme were vulnerable victims.  After determining the sentencing range as 18 to 24 months, the trial court sentenced Scurlock to 24 months for each count to run concurrently.  Scurlock challenges several of the trial court's factual findings regarding her sentence.

We review the application of the Sentencing Guidelines *de novo*.[26]  And, we review the trial court's findings of fact for clear error.[27]  "A factual finding is not clearly erroneous as long as the

---

[25]    *United States v. Whittington*, 783 F.2d 1210, 1215 (5th Cir.), cert. denied, 479 U.S. 882 (1986).

[26]    *United States v. Jackie Brown*, 7 F.3d 1155, 1159 (5th Cir. 1993).

[27]    *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993), cert. denied, 114 S.Ct. 1076 (1994).

14

finding is plausible in light of the record as a whole."[28]

### 1. Amount of Loss

Under U.S.S.G. §2F1.1, the base offense for mail fraud is six. The Guidelines provide for an incremental increase of the offense level if the loss suffered by the victims of the fraud was over $2,000. In this case, the PSI recommended increasing Scurlock's offense level by 3 because the amount of loss was determined to be $10,186. Scurlock objected to this recommendation and argued that her liability for sentencing purposes should be limited to the $1,200 she actually handled. The district court reserved ruling on this objection at the sentencing hearing but did not address the issue in its later order answering the defendant's objections to the PSI.

On appeal, Scurlock continues to argue that the offense level for her sentence should be based on the $1,200 she actually handled rather than the total amount of loss of the fraud scheme as a whole. In other words, since her criminal acts only directly involved $1,200, Scurlock argues that her sentence should not be enhanced because of the additional losses caused by other members of the scheme about whom Scurlock had no knowledge.

In response, the government cites U.S.S.G. §1B1.3(a)(1)(B) which provides that relevant conduct includes all the reasonably foreseeable acts of the members of a jointly undertaken criminal activity. According to the government,

---

[28] *Jackie Brown*, 7 F.3d at 1159.

15

Scurlock should be held accountable for the entire loss since it was foreseeable that all the profits from the money order scam would not be returned to the prisoners. That is, Scurlock should have known that the $1,200 she received was merely a fraction of the illegal profits gained from the scheme.

U.S.S.G. §1B1.3(a)(1)(B) provides that, for sentencing purposes, a defendant is responsible for the reasonably foreseeable acts of their partners taken in furtherance of a jointly undertaken criminal activity. As noted in the comments, however, "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant".[29] Also, Scurlock is only responsible for the amount of loss that was reasonably foreseeable to her. For each defendant, "reasonably foreseeability does not follow automatically from proof that [the defendant] was a member of the conspiracy".[30] Thus, a sentencing court cannot assume that all acts of each participant in a jointly undertaken criminal activity were reasonably foreseeable to all participants.[31] In this case, two findings are necessary: the amount of loss caused by the entire conspiracy and the amount of loss reasonably foreseeable to

---

[29] U.S.S.G. § 1B1.3(a)(1)(B) comment 2.

[30] *United States v. Puma*, 937 F.2d 151, 160 (5th Cir. 1991), cert. denied, 502 U.S. 1092 (1992).

[31] *Puma*, 937 F.2d at 160; *United States v. Foy*, 28 F.3d 464, 476 (5th Cir.), cert. denied, 115 S.Ct. 610 (1994); *United States v. Puig-Infante*, 19 F.3d 929, 942-43 (5th Cir.), cert. denied, 115 S.Ct. 180 (1994).

16

Scurlock.[32]

As noted above, the district court did not specifically address the issue of reasonable foreseeability in its sentencing order and neither did the PSI.  "On review of a sentence imposed pursuant to section 1B1.3 of the Guidelines, we require the sentencing court to make an express finding that the conspiratorial activity at issue was reasonably foreseeable."[33]  Here, the district court attributed the entire amount of loss to Scurlock without making a specific finding regarding what amount was reasonably foreseeable to her.  We, therefore, vacate the sentence and remand to allow the district court an opportunity to make this determination.  In making this determination the sentencing court should consider "the defendant's relationship with co-conspirators and [her] role in the conspiracy".[34]

### 2.   More Than Minimal Planning

Under U.S.S.G. §2F1.1, a defendant's sentence will be enhanced by two levels if "the offense involved more than minimal planning, or  . . . a scheme to defraud more than one victim".  The

---

[32]     *Puma*, 937 F.2d at 160; *Foy*, 28 F.3d at 476; *Puig-Infante*, 19 F.3d at 942-43.  Although the cited cases address the amount of drugs for which a particular member of a conspiracy can be held accountable, the focus of the analysis is the proper application of U.S.S.G. §1B1.3(a)(1)(B).  As explained, this section governs a defendant's relevant conduct for sentencing and places limits on a defendant's responsibility for the acts of others. We find that this Court's previous interpretation of this general provision in drug cases is equally applicable in this case.

[33]     *Puig-Infante*, 19 F.3d at 943.

[34]     Id. at 942.

district court adopted the findings of the PSI and enhanced Scurlock's sentence for more than minimal planning or, alternatively, because the scheme injured more than one victim.

The altered money order scheme in which Scurlock participated involved an elaborate plan requiring the inmates formation of a relationship with a victim, the purchase and altering of money orders, the transmission of illegal proceeds through the mails, and smuggling the funds into the prison. In contrast, "[t]o commit a money order scam in its `simple form,' a defendant would merely obtain money orders, alter the amounts, and cash them."[35] Thus, the district court did not err when it determined that Scurlock's offense involved more than minimal planning. The district court was also not clearly erroneous in determining that Scurlock's offenses involved more than one victim since the specific funds she carried to Shorter were traced back to two victims of the scheme, Donna Jean Armstrong and Louise Brewer.

In challenging this enhancement, the defendant argues that both this enhancement and the enhancement for abuse of a position of trust were based on her position at Parchman Penitentiary as a guard. As such, Scurlock argues that imposing both enhancements for the same fact or activity is impermissible double counting. We cannot agree.

Each enhancement targets different aspects of a defendant's behavior. An increase for an abuse of a position of trust is imposed if a defendant's job places the defendant in a

---

[35] *Jackie Brown*, 7 F.3d at 1160.

18

superior position to commit a crime and the defendant takes advantage of that superior position to facilitate a crime. The enhancement for more than minimal planning targets whether a scheme to defraud was an elaborate one and, therefore, more difficult to detect. These two enhancements are based on different aspects of behavior and the imposition of both does not constitute impermissible double counting.

In this case, Scurlock received an enhancement for abuse of a position of trust because of her position as a guard at Parchman Penitentiary and her willingness to use that position to aid her in illegal activity. The enhancement for more than minimal planning was imposed because of the complex nature of the scheme to defraud in which she participated. The district court committed no error when it imposed both enhancements. Thus, we reject the defendant's challenge of the two level enhancement imposed for more than minimal planning.

*3. Abuse of a Position of Public Trust*

Scurlock contends that U.S.S.G. §3B1.3 should not be applied to enhance her sentence because, although she occupied a position of trust, that position did not facilitate her criminal activity as required by the Sentencing Guidelines. §3B1.3 provides for a two level increase "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . .". Scurlock argues that her position as a prison guard at Parchman did

19

not facilitate her illegal activities.

This Court addressed a similar argument in *United States v. Leroy Brown* in which a correctional case manager at Parchman Penitentiary was convicted on similar charges and sought review of his sentence.[36]  Brown argued that although he occupied a position of trust at Parchman, that position did not facilitate his crimes since any other Parchman employee had the same opportunities and access to the prisoners.[37]  This Court rejected his argument and decided that, in determining whether an abuse of a position of trust facilitated criminal acts, the defendant should be compared with the public at large.[38]  The Court concluded that, as a case manager, Brown occupied a superior position because of the opportunity to interact freely with the prisoners.[39]  This superior position did facilitate his crimes.[40]

"The public places a great deal of trust in correctional officers.  They expect that the officers will not participate with inmates in schemes to violate the law."[41]  In this case, Scurlock held a position of trust at the prison.  The district court decided that Scurlock's position as a prison guard at Parchman facilitated

---

[36]     941 F.2d 1300, 1302 (5th Cir.), <u>cert. denied</u>, 502 U.S. 1008 (1991).

[37]     <u>Id.</u> at 1304-05.

[38]     <u>Id.</u>

[39]     <u>Id.</u>

[40]     <u>Id.</u>

[41]     <u>Id.</u> at 1305.

20

her criminal acts and we agree. Scurlock abused her position when she used her ability to interact with the prisoners to enter a criminal venture, arrange for her receipt of packages containing illegal profits, and eventually smuggle the money into the prison. In fact, there is evidence in a letter from Porter Shorter to his wife that Shorter specifically chose Scurlock for this scheme because he was afraid his wife would be caught attempting to smuggle money into the prison. Unlike the visitors of prisoners, Scurlock had freedom within the prison which she used to aid Shorter in his money order scheme. We, therefore, affirm an enhancement of Scurlock's sentence for abuse of a position of public trust under U.S.S.G. §3B1.3.

### 4. Vulnerable Victims

Finally, Scurlock argues that the district court committed clear error when it determined that the victims targeted by this scheme were "unusually vulnerable" and it imposed a two level increase under U.S.S.G. §3A1.1. §3A1.1 requires an enhancement of sentence "if the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct". Scurlock argues that there was no evidence regarding the vulnerability of the victims and that the PSI's conclusion that this enhancement was proper is not substantiated by the record.

The PSI identifies the victims of Scurlock's acts as

Donna Jean Armstrong and Louise Brewer, two women who responded to Shorter's requests to cash money orders and forward the funds to him. Based on an examination of the dates of all of the relevant transactions, it was concluded that the $1,200 Scurlock smuggled into the prison was a portion of the proceeds sent by Armstrong and Brewer to an associate of Shorter after cashing the altered money orders.[42]

The report notes that the operation of the scam depended on contacting victims through personal advertisements and falsely promising a relationship in order to get them to cash the altered money orders on behalf of the prisoners. Thus, the nature of the scheme was to take advantage of the victims by preying on their loneliness. This general description of the type of victim targeted is supported by the testimony of the actual victims. For example, Brewer, a retired widow, testified that Shorter contacted her under an assumed name after she placed an advertisement in a magazine called "Cupid's Destiny".[43] Through their correspondence,

_____

[42]     See, PSI at 6, paragraph 19. As detailed in the PSI, Brewer received eight altered money orders with a total face value of $5,600. Brewer then sent Shorter's associate $2,600, funds received by cashing altered money orders, on or about April 30, 1992. The package was received by Shorter's associate on or about May 2, 1992. On or about May 2, 1992, a package containing $700 in cash was sent by Shorter's associate to Scurlock's personal post office box. The package was received and signed for by Scurlock on May 6, 1992. Armstrong received six altered money orders with a total face value of $4,200. Armstrong, at Shorter's direction, sent $4,000 to Shorter's associate, funds received by cashing altered money orders, on or about June 9, 1992. The package was received by Shorter's associate on June 11, 1992. On June 19, 1992, Shorter's associate sent Scurlock $500. Scurlock signed for the package on June 20, 1992.

[43]     Record, volume 2 at 86.

22

Shorter convinced Brewer that he was about to be released from prison and returned to his well-established catfish farm in Mississippi, and even that they might be married upon his release.[44]

In *United States v. Jackie Brown*, while reviewing the sentence of a former contract food manager at Parchman convicted because of his participation in a similar scheme, we concluded that:

> Not only were the victims of the Parchman scam *specifically* chosen for their age, loneliness, and gullibility, but the district court could have reasonable concluded that lonely, elderly widows, *as a group*, are more susceptible than the general public to this type of fraud.[45]

In this case, the two victims were clearly targeted because Shorter felt he could take advantage of their loneliness and desire for companionship. Scurlock argues, however, that the record does not indicate the age of the victims and does not contain information sufficient to conclude that they were unusually vulnerable.

The trial court had an opportunity to see the victims and make a first-hand assessment of their vulnerability. As this Court noted in *Jackie Brown*:

> The determination of "vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly

---

[44]    Record, volume 2 at 97, 102.

[45]    *Jackie Brown*, 7 F.3d at 1160-61 (emphasis in original).

23

> articulate completely," and is certainly "not reducible to a calculation of the victim's age or a diagnosis of the victim's disease."[46]

In the light of the record and this Court's previous willingness to characterize women targeted by this scheme as unusually vulnerable, we cannot say that the district court's conclusion that the victims in this case were unusually vulnerable was not "plausible in light of the record as a whole".[47]  We, therefore, affirm the district court's enhancement of Scurlock's sentence for vulnerable victims.


                              III.


        We AFFIRM the defendant's conviction and several aspects of the sentence imposed.  We VACATE the sentence, however, on the issue of the amount of loss attributable to Scurlock and REMAND for resentencing after a determination of what amount of loss was reasonably foreseeable to the defendant under U.S.S.G. §1B1.3(a)(1)(B).

---

[46]      *Jackie Brown*, 7 F.3d at 1160 (quoting *United States v. Mejia-Orosco*, 868 F.2d 807 (5th Cir. 1989)).

[47]      *Jackie Brown*, 7 F.3d at 1159.