**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-30010

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATSY KING; GARY VAN DANIELS; RHONDA GAIL BROWN,
MONICA BROWN DANIELS; KERRY D. DANIELS, ET AL.,

Defendants-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana
(95-CR-30006)

October 25, 1996

Before POLITZ, Chief Judge,  EMILIO M. GARZA,  and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:[*]

Appellants  Patsy King ("King"), Gary V. Daniels ("G. Daniels"), Monica Brown Daniels ("M. Daniels"), Kerry Daniels ("K. Daniels") and Rhonda Brown ("Brown") appeal their convictions on various counts ranging from conspiracy to commit fraud to obstruction of justice charges. Twelve defendants were originally charged in a thirty-one-count indictment. Four of the defendants pled

---

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

guilty to various counts of the indictment pursuant to written plea agreements. The remaining defendants were found guilty in a jury trial on December 7, 1995. G. Daniels and M. Daniels base their appeal on the application of double jeopardy barring their criminal prosecution. The basis of the remaining appellants argument on appeal is that there was insufficient evidence to sustain their convictions. We find that based on a careful examination of the record and the briefs of the parties that there was sufficient evidence to sustain the convictions and that double jeopardy was not applicable. Therefore, we AFFIRM.

## BACKGROUND

On March 15, 1991, D & B Medical Transportation ("D & B") was approved by the Louisiana Department of Health and Hospitals ("DHH") to begin providing nonemergency transportation to Medicaid eligible patients. The co-owners of D & B were defendants' G. Daniels and Brown, who started D & B earlier that year. The Non-Emergency Medical Transportation Program ("NEMT"), was designed to provide transportation for Medicaid patients when they required Medicaid-covered services. Approved NEMT companies, like D & B, were compensated for pickups and actual mileage traveled. The pickup fee ranged from $17.00 to $20.00, and the mileage rate was $.55 to $.60 per mile. If more than one patient was transported only an additional $8.50 to $10.00 per additional patient would be paid, with no additional mileage fee paid. Billing was handled by Uniysis, an intermediary of DHH and was done by filing verification forms which were signed by the patient, the doctor and the driver. The billing could be submitted electronically, however, the payment for services rendered was received in the form of a check mailed to the owner

2

or designated agent of the company. In this case the checks were initially mailed out payable to G. Daniels, and later were sent payable to both G. Daniels and Brown.

Initially, D & B operated out of Wisner, Louisiana, located in Franklin Parish, but eventually they operated in six parishes: Franklin, Richland, Ouachita, Catahoula, Concordia and Tensas. Each office had a parish supervisor. During the life of D & B several fraudulent acts occurred. Several drivers testified that during the first couple of years of D & B's existence they were instructed to leave the mileage section of the verification forms blank. They were told that someone else would fill in the mileage. G. Daniels or someone else in the office would then fill in inflated mileages on the forms. There were various methods of arriving at the mileage, though rarely was the 'actual' mileage used. The false mileage was referred to as the "payable miles." Payable miles always exceeded actual miles, thus, the billing was inflated.

Eventually, sometime in 1993, the drivers were instructed to log miles for themselves, however, widespread fraud continued. Drivers doctored their daily trip logs to reflect that each patient was transported individually and that two round trips were made. Rarely were two round trips ever made and in several cases' trips were billed as single trips although they were "multiples." Drivers also filled out "ghost riders" for patients never transported, yet for whom services were billed. Widespread forgery was also uncovered, as medical office and hospital employees' signatures were forged.

Also, in 1993, after the state started cracking down on billing fraud, G. Daniels created a "logging team" consisting of his mother-in-law, Ruby Brown, and others. The logging team's job was to create or alter trip logs to match previously billed verification forms for which no trip logs had ever been created. Among the places where logging occurred was defendant King's house. One of the

3

rules that was implemented for the logging team was that no driver could log more than 700 miles in one day. To avoid exceeding 700 miles, either the driver's name or the date of travel was altered. The times of doctor's appointments were changed to give the appearance that the trips were singles. To complete the scheme, the vehicle odometers were altered to match the altered paperwork. Lonnie Bell, Roger Humphrey and Richard Gibson were the mechanics who altered the odometers.

Finally, in 1994, after the Government issued a federal grand jury indictment, a week of logging occurred at King's house and at Razz-Ma-Tazz, a day care center operated by defendant M. Daniels.[1] Several witnesses testified that during that week they were altering and creating documents, which had been subpoenaed by the grand jury. On March 16, 1995, twelve defendants were charged in a thirty-one-count indictment. Defendants Anita Coleman, Jessie Walters, Roger Humphrey and Mose Lyons, pled guilty to various counts of the indictment pursuant to written plea agreements that required them to testify against their co-defendants.[2]

Prior to trial, the government, by administrative procedure, seized and forfeited $150,000 from the community bank accounts of G. and M. Daniels. All of the defendants who are appealing were found guilty of various counts[3] and sentenced on December 7, 1995. In conjunction with the

---

[1]This activity was referred to by the defendants as a "logging party" and herein will be referred to as such.

[2]These defendants, all former D & B employees, provided much of the inside information the government used to present its case in the district court.

[3]G. Daniels was convicted of 1 count of conspiracy, 19 counts of mail fraud, 2 counts of obstruction of justice, 6 counts of odometer tampering, 2 counts of money laundering and 1 forfeiture count. M. Daniels was convicted of 1 count of conspiracy, 16 counts of mail fraud, 1 count of obstruction of justice, 1 count of money laundering and 1 forfeiture count. King was convicted of 1 count of conspiracy and ten counts of mail fraud. Brown was convicted of 1 count of conspiracy, 14 counts of mail fraud and 1 count of obstruction of justice. K. Daniels was convicted of 1 count of conspiracy and 1 count of obstruction of justice.

4

sentencing of G. Daniels and M. Daniels, an order of forfeiture was also entered. Defendants now appeal their convictions, G. and M. Daniels on double jeopardy grounds and the remaining defendants on sufficiency of the evidence grounds.

## DISCUSSION

**Standard of Review**

We review a challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We affirm if a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Id.* All credibility determinations and reasonable inferences are to be resolved in favor of the jury's verdict. *U.S. v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994). Thus, the court should not concern itself with the correctness of the jury verdict; rather, the decision for the court is whether the finding of guilt is reasonable under all the circumstances. *Jackson*, 443 U.S. at 318-319.

**A. Double Jeopardy Bar.**

G. and M. Daniels originally appealed their convictions on the theory of double jeopardy. They argued that pre-trial civil forfeiture proceedings barred any subsequent criminal prosecution of them. However, after the briefs were filed, but prior to oral arguments, the Supreme Court in *United States v. Ursery*, 1996 WL 340815 at 16, held that "in rem civil forfeitures are neither 'punishment' nor criminal for purposes of the double jeopardy clause." Appellants conceded at oral arguments that *Ursery* forecloses their double jeopardy claims. Accordingly, we reject the double jeopardy claims and affirm their convictions.

5

**B. Conspiracy and Mail Fraud.**

King and Brown argue that the evidence was insufficient to support their convictions on conspiracy and wire fraud counts. K. Daniels argues that there was insufficient evidence to warrant his conviction for conspiracy to commit mail fraud. We disagree.

To prove conspiracy, the government must prove beyond a reasonable doubt that (1) two or more people agreed to pursue an unlawful objective together, (2) the defendant voluntarily agreed to join the conspiracy, and (3) one of the members of the conspiracy performed an overt act to further the conspiracy. 18 U.S.C. § 371 (1994)*; U.S. v. Faulkner*, 17 F.3d 745, 768 (5th Cir.), *cert. denied*, 115 S.Ct. 193 (1994), *reh'g dismissed*, 115 S.Ct. 786 (1995). Furthermore, the elements of mail fraud under 18 U.S.C. § 1341(1994) are (1) participating in a scheme to defraud and (2) causing the mails to be used for purposes of executing the scheme. *U.S. v. Scurlock*, 52 F.3d 531, 537 (5th Cir. 1995); *Nguyen*, 28 F.3d at 481. We conclude that the evidence adduced at trial was sufficient to allow a rational jury to find the essential elements of the crimes beyond a reasonable doubt.

**1. Patsy King**

King, the administrative secretary for the D&B main office in Wisner, Louisiana, argues that the evidence was insufficient to convict her of mail fraud and conspiracy to commit mail fraud. She claims that during her entire tenure at D&B, she worked only as a secretary and she was paid an hourly wage. She contends there is no evidence to suggest that she profited from the inflated mileage. She admits that she would write down mileage on the verification forms but only at the request of her boss, G. Daniels, who instructed her to do so. In essence, King asserts that the act of a secretary who does not drive, who does not know anything about mileage, and who writes down

mileage given to her boss without any economic gain does not constitute participation in mail fraud or conspiracy to commit mail fraud.

Anita Coleman, the Franklin Parish Office and Driver Supervisor, testified that she and King were responsible for reviewing verification forms before they were forwarded to the DHH office for billing. While the record does not contain a written job description for King, Coleman's testimony details that King's duties included recording verification information on the forms as well as occasionally recording mileage. Coleman testified that on at least one occasion while G. Daniels was out of town, he called the Wisner office and spoke to King. G. Daniels then instructed King to fill in the mileage section on several verification forms with grossly inflated mileage he provided. Roger Humphrey also testified to an instance when he was with G. Daniels and G. Daniels called King at the Wisner office with inflated mileage to be recorded on the verification forms. As further evidence of King's involvement, Coleman identified King's handwriting on 45 to 50 verification forms made over a period of approximately one year which had inflated mileage recorded on them. Viewing the evidence in a light most favorable to the verdict, the jury was entitled to find from the evidence that King's general and specific responsibilities in the Wisner office provided her with more than ample opportunities to become familiar with the modus *operandi* employed by Daniels and Brown. Moreover, given the specific testimony by Anita Coleman, the jury was entitled to find that the inflated mileage was so obvious on the forms that it could readily and properly conclude that King knowingly participated in the conspiracy and mail fraud.

The evidence shows that King was living in a home owned by G. Daniels. She argues that she was not aware that the logging activities conducted in her home was criminal in nature. Several witnesses testified that during the week of the subpoena's issuance, logging was taking place at

King's home for several hours during the day and continued well into the night. Samuel Taylor, G. Daniels' nephew, testified that he saw King at her house during the logging party the week the subpoena was issued. In addition, D&B drivers, Marilyn Green and Herbert Ray Daniels, testified to actually seeing King at the logging party. Given that the logging team began operating in late 1993 and worked at King's house on a daily basis for several months, the jury was entitled to infer from the totality of the evidence that King was well aware of the scheme to defraud and she was a willing participant in that scheme.

### 2. Rhonda Brown

Brown argues that the evidence was insufficient to sustain her convictions for conspiracy and mail fraud. In particular, she contends that her status as co-owner was in name only and that she was basically a driver. However, the evidence adduced clearly establishes that she was sufficiently involved in the activities to warrant a conviction. Government Exhibit #52 shows Brown identifying herself as a co-owner of D & B Transportation. Exhibit #52, a letter to DHH by Brown, dated 1/7/96, asks the question, "why the reimbursement checks are only sent in the name of Gary V. Daniels my partner?" We have already related the evidence of G. Daniels active involvement in D & B as well as his involvement in the scheme.[4] Moreover, Brown, cannot be said to be a passive or silent partner in the operation as a co-owner with G. Daniels. Brown, was the only D & B partner who had previously worked for a non-emergency medical transportation company.[5] Consequently, it was

---

[4]G. Daniels' undisputed involvement in this conspiracy to defraud Louisiana, satisfies the element under § 371 that requires one of the conspirators to make an overt act in furtherance of the conspiracy. However, each defendant's actions alone can also satisfy this element.

[5]Gala Carradine, cousin to G. Daniels and K. Daniels, testified on cross examination:
**Q:** Earlier, to Mr. Willis, you stated that Gary Daniel's and Rhonda Brown were owners of D & B. **A:** Yes.

Brown, not G. Daniels, who was familiar with NEMT operations. Additionally, and a very obvious piece of evidence against Brown, was the 'ghost rider' verification form she filled out.[6] By forging Sherry Robinson's signature and knowing that the payment from DHH was received through the mail, Brown conclusively established that she agreed[7] to defraud the state of Louisiana. Again, no formal agreement must be shown, or any words spoken, to prove the existence of a conspiracy. Finally, the government introduced a verification form, exhibit #50, written in Brown's handwriting and noting her as the driver, which had the words "double mileage" written on top. Based on all of the evidence presented, a rational jury could have found beyond a reasonable doubt that Brown was a conspirator and participated in mail fraud.

### 3. Kerry Daniels

K. Daniels argues that there was insufficient evidence to convict him of conspiracy to commit mail fraud. Specifically, he contends that the activities under investigation took place prior to his

---

**Q:** How? **A:** How did I know that?
**Q:** Yes! **A:** I was told that when I first made it back, I asked them what the D & B stand for. D for Daniels and B for Brown, Rhonda Brown.
Ruby Brown, Rhonda's sister, testified on direct examination:
**Q:** Ms. Brown, can you tell me how your sister, Rhonda and Gary Daniels started D & B Medical Transportation? **A:** They started in my house. Started, Rhonda was already driving for another company . . . And Gary was looking for work . . . And so I suggested that Rhonda and Gary go into business together.

[6]A ghost rider is a completed verification form which is billed to Medicaid when no trip was actually made. Government exhibit 4G is a verification form listing Brown as the driver of a D & B patient transported to Dr. Walters' office. Brown forged the signature of Sherry Robinson on the verification form, verifying that the patient was seen that day. However, Brown signed the wrong name for Ms. Robinson, an ex school mate of Brown's, who now uses her married name Davis. Mrs. Davis is employed as a laboratory assistant at Dr. Walters' office. Anita Coleman identified the signature as Brown's handwriting.

[7]*See* note 4. Brown's actions when coupled with G. Daniels's actions unequivocally satisfy the requirements for conspiracy under § 317.

employment at D & B and that there was no evidence that he fraudulently filled out verification forms. We find the evidence was sufficient to support the jury's verdict. Not less than ten witnesses testified that K. Daniels was present at the logging parties at the Razz-Ma-Tazz Day Care Center.[8] Specifically, Angela Smith, office clerk at the Monroe office, testified that on one occasion K. Daniels was supervising the logging parties and answering any questions regarding the logging. Furthermore, K. Daniels was also identified as a logger himself, both before and after he became supervisor of the Tensas office. The evidence also showed that K. Daniels instructed drivers to fraudulently bill trips to increase the reimbursement amount. Lori Jones, a Tensas driver, testified that K. Daniels expressed to her that the only way to make money was to bill multiple trips as single trips. [9]

The evidence showed that K. Daniels maintained two folders for the purpose of logging patients trips under a different driver's name. In addition, on papers taken from the Tensas office, he wrote various patients' names who needed to be logged under a different driver.[10] This overwhelming evidence shows that K. Daniels was an active member of the conspiracy to defraud the state of Louisiana. Moreover, even though the conspiracy had already begun, he, nevertheless, willingly joined

---

[8]Former D & B employees Anita Coleman, Yure Brass, Gala Carradine, Francis Williams, Ruby Brown, Jessie Walters, Angela Smith, Roger Humphrey, Lori Jones and Herbert Ray Daniels all testified to seeing K. Daniels at the Razz-Ma-Tazz Day Care Center during the week the subpoena was issued.

[9]Lori Jones testified:
> **Q:** What type of instruction regarding multiples or singles and continuous mileage did you receive from Kerry Daniels? **A:** Well, he told us that if we wanted to make any money and some money for the company . . ., there was no such thing as multiples, to take them all at once.

[10]Government exhibits 82, 82A and 84 consisted of two folders and three sheets of 5 x 7 paper, respectfully. The handwriting was verified as being that of K. Daniels and the notations on the folders and the papers seem to validate the existence of logging activities.

it in progress. Therefore, we conclude that the evidence was sufficient for the jury to convict K. Daniels.

**C. Obstruction of Justice**

Brown and K. Daniels challenge the sufficiency of the evidence supporting their convictions for obstruction of justice. The government's theory was that the defendants, by attending and knowingly participating in the logging parties the week the subpoenas were issued, were guilty of obstructing justice under 18 U.S.C. § 1503 (1994). Section 1503 was enacted to "protect individuals involved in federal judicial proceedings and to prevent miscarriages of justice by corrupt methods." *U.S. v. Williams*, 874 F.2d 968, 976 (5th Cir.), *reh'g denied*, 787 F.2d 1435 (1989). The three essential elements that the government must establish to prove a violation of the omnibus clause of section 1503 are: (1) there must be a pending judicial proceeding; (2) the defendant must have knowledge or notice of the pending proceeding; and (3) the defendant must have acted corruptly with the specific intent to obstruct or impede the proceeding in its due administration of justice. *Williams*, 874 F.2d at 977.

Brown was identified in trial testimony as attending the logging parties the week the subpoenas were issued. Testimony verified that the activities consisted of creating logs, altering verification forms as well as packing and sorting boxes. Several of the people involved in the logging testified they knew of the subpoena, and that they knew that the FBI was involved. Specifically, Ruby Brown, Brown's sister and a D & B driver, testified that during the week of the subpoena, Brown was at the Razz-Ma-Tazz Day Care Center logging. In addition, and probably most important, was

11

that Brown held herself out as a partner of D & B transportation with G. Daniels.[11]   Thus, a rational jury could infer that based on her status as co-owner of the business that Brown had as much knowledge as the other loggers about the FBI involvement and that she actually participated in the attempt to circumvent the authority of the subpoena, *vis-a-vis* the logging parties.

Similarly, K. Daniels was also identified as present at the logging parties during the same week and was also logging. Angela Smith and Anita Coleman testified that K. Daniels was instructing loggers and answering questions regarding logging at the Razz-Ma-Tazz during the week of the subpoena. The evidence also showed that K. Daniels was one of the supervisors that week. Finally, Gala Carradine testified that K. Daniels was at the Razz-Ma-Tazz every day logging during the week of the subpoena. K. Daniels argues that this evidence, although seeming to incriminate him on the element of acting corruptly during the existence of a grand jury investigation, does not prove his knowledge of the subpoena.[12] We do not agree with this conclusion. Being a supervisor at the Tensas office and a participant at the logging parties, the jury could reasonably conclude from all the evidence that Daniels was aware of the FBI investigation and that he like Brown actually participated in the attempt to circumvent the subpoena. There was ample evidence from which the jury could reasonably infer that all the individuals involved in the logging activities had knowledge of the subpoena.

## CONCLUSION

---

[11]Exhibit 86, a "Disclosure of Ownership and Control Interest Statement," dated 2/25/91, names D & B Transport as the name of the entity and designates it as a "partnership," with G. Daniels and Brown signing as "co-owners."

[12]Jessie Walters, the Richland Parish supervisor, Marilyn Green, a Richland driver, Roger Humphrey and Ruby Brown testified that they knew of the subpoena. Angela Smith testified that she knew that the FBI was involved.

After reviewing all of the evidence in the light most favorable to the verdict; we find sufficient evidence to support the jury's finding that the government proved all essential elements of each crime charged beyond a reasonable doubt. There was sufficient evidence of intent to defraud to convict Brown, King and K. Daniels of conspiracy and for mail fraud. Likewise, there was sufficient evidence of knowledge of the ongoing grand jury investigation to convict Brown and K. Daniels of obstruction of justice. The double jeopardy claims of Gary and Monica Daniels are rejected as a matter of law. AFFIRMED.