UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-7707
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

JACKIE V. BROWN,

                              Defendant-Appellant.

_____

Appeal from the United States District Court for the
          Northern District of Mississippi
_____
                (November 10, 1993)


Before GARWOOD, DAVIS and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

    Defendant-appellant Jackie Brown (Brown) participated in a
money order scam operating out of Parchman State Penitentiary in
Mississippi.  A jury found him guilty of conspiracy to alter and
pass altered postal money orders and aiding and abetting mail
fraud.  The district court imposed concurrent sentences of 15
months' imprisonment and 3 years' supervised release on each count,
and ordered Brown to pay $1,092 in restitution.  Brown appeals the
district court's application of the Sentencing Guidelines and
certain evidentiary rulings.  We affirm.

## Facts and Proceedings Below

In January 1992, Evelyn Lomoriello (Lomoriello), a sixty-five-year-old Florida retiree, began corresponding through a "lonely hearts pen-pal club" with Richard Sims (Sims), an inmate at Parchman State Penitentiary in Mississippi.  In April  1992, Lomoriello began accepting collect calls from Sims.  In their conversations, Sims informed her that he planned to receive several money orders from Johnny Clark, whom he represented as his case worker.  Telling Lomoriello that he needed the money to pay his fines, Sims asked her to deposit the money orders in her bank account and to send $5,000 of the money to a man identified as Jackie Brown in Cleveland, Mississippi.

On April 3, 1992, Lomoriello received 8 $700 money orders, totalling $5,600.  Pursuant to Sims's instructions, she deposited them in her account, sent $5,000 to Brown in Cleveland by wire transfer, paid $200 to Western Union, and kept $400 for herself to pay for the collect calls.  When Lomoriello's bank discovered the money orders had been altered to reflect $700 instead of their true $1 face values, the bank charged the $5,600 back to her account. Two weeks later, Lomoriello received a second set of altered money orders from Clark.  By this time, however, police had warned her of the scam, and she turned the altered money orders over to postal authorities.

On April 6, 1992, Brown, a contract food manager at Parchman, received three Western Union drafts (one in the amount of $1,000 and two $2,000 drafts), and attempted to cash them the following day.  The Western Union agent cashed only the $1,000 draft and then

2

called the police to inform them that Brown, using Parchman prison identification, had received the money from a woman in Florida. After learning from Lomoriello that she had been corresponding with a Parchman inmate, Detective Serio of the Cleveland Police Department attempted to contact Brown. On April 8, 1992, Brown came to the police station and turned over the two uncashed $2,000 drafts and $500 of the draft that he had cashed. The following day, Brown voluntarily returned to the police station and gave Inspector Collins a handwritten statement admitting that he had picked up the money orders at the direction of Parchman inmate Ronnie Franklin. At trial, Brown admitted he was to receive $500 for smuggling the money into Parchman.

Josephine Fortner (Fortner), a Michigan retiree, testified that she had also been corresponding with an inmate at Parchman named Richard Sims. Fortner received $3,500 in altered money orders from Johnny Blackman, who claimed to be Sims's case worker. Following Sims's instructions, she cashed the money orders, kept $500 for herself, and sent $3,000 via Express Mail to Jackie Brown at 900 White Street, Apartment 10-D, Cleveland, Mississippi. Upon discovery of the alterations, her bank charged the $3,500 to her account.

Brown was indicted and found guilty on charges of conspiracy to alter and pass altered postal money orders in violation of 18 U.S.C. § 371 (count one), and aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 and 1343 (count two). Over his objections to the presentence report (PSI), the district court imposed concurrent sentences of 15 months' imprisonment and 3

3

years' supervised release on each count, and ordered Brown to pay $1,092 in restitution to Lomoriello.  Brown now appeals, arguing that the district court erred by (1) misapplying the Sentencing Guidelines, (2) refusing to dismiss count two as duplicitous, (3) admitting evidence of other money orders sent to Lomoriello and cash sent to Brown's address, and (4) refusing to admit a handwriting report. Brown's brief also makes a passing assertion that the district court erred by admitting Brown's written statement.  We find no reversible error, and accordingly we affirm.

## Discussion

I.   Application of the Sentencing Guidelines

The base offense level for fraud and deceit is six.  U.S.S.G. § 2F1.1(a).  The district court, in sentencing Brown, added a total of eight additional offense levels.  We review the district court's application of the Sentencing Guidelines *de novo*, and we review its findings of fact under a clearly erroneous standard.  *United States v. Wimbish*, 980 F.2d 312, 313 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 2365 (1993).  A factual finding is not clearly erroneous as long as the finding "is plausible in light of the record as a whole." *Id*.

A.   *Amount of Loss*

The Sentencing Guidelines provide for a 2-offense level enhancement if the loss resulting from a fraud or deceit offense exceeds $5,000.  U.S.S.G. § 2F1.1(b)(1)(C).  Since the district court's calculation of the amount of loss is a factual finding, we review this determination for clear error.  *Wimbish*, 980 F.2d at 313; *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993).

4

Brown argues that since he returned the 2 uncashed money orders and $500 in cash, the actual loss caused by his actions was only $700 ($500 he spent and $200 charged by Western Union).  Section 2F1.1, however, states that if the "intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."  U.S.S.G. § 2F1.1, comment. (n. 7).  Where a defendant attempts to pass altered or forged checks, the face value of the checks reflects the intended loss, even if the money is recovered or returned.[1]  *Wimbish*, 980 F.2d at 316; *see also Sowels*, 998 F.2d at 252 (combined credit limit of stolen credit cards totalling $351,600 represented intended loss regardless of the actual charges made); *United States v. Lghodaro*, 967 F.2d 1028, 1031 (5th Cir. 1992) (full value of fraudulently filed insurance claim even though defendant only received a portion of the claim).  In the present case, the defendant clearly intended Lomoriello to suffer a loss exceeding $5,000.  He should not be rewarded simply because law enforcement officials thwarted his plans.

---

[1]     The Application Notes to section 2F1.1 state that "if the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000."  U.S.S.G. § 2F1.1, comment. (n. 7).  The district court calculated the intended loss at $9,100 based on the face value of both sets of money orders sent to Lomoriello.  Arguably, the intended loss should be confined to the first set of Lomoriello money orders and reduced by the $400 Lomoriello was to keep since the conspirators never intended her to lose that portion of the money.  However, at a minimum, they intended her to lose the $5,000 she wired to Brown and what she would have to pay to Western Union to send the funds to Brown ($200, as it turned out).  Since the resulting intended loss still exceeds $5,000, the sentence enhancement would still apply.

5

*B.    More Than Minimal Planning*

The Sentencing Guidelines provide for an enhancement of two offense levels "[i]f the offense involved (A) more than minimal planning, or (B) a scheme to defraud more than one victim." U.S.S.G. § 2F1.1 (b)(2).  The Guidelines define "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form," or "[taking] affirmative steps . . . to conceal the offense."  U.S.S.G. § 1B1.1, comment. (n. 1 (f)).  The determination as to whether the "defendant engages in more than minimal planning is a fact question reviewed under the clearly erroneous standard."  *United States v. Barndt*, 913 F.2d 201, 204 (5th Cir. 1990).

The PSI indicates the criminal conspiracy in which Brown participated was an elaborate scheme involving significant planning to obtain and alter United States Postal Service money orders, to target and manipulate specific victims, to conceal the offense, and to smuggle the proceeds into the penitentiary.  The scam required coordination and cooperation among at least one prison inmate, the alleged "case worker" who sent the altered drafts to Lomoriello, and Brown.  Brown's role alone, which involved picking up the drafts, cashing them, and smuggling the money back into Parchman, took more than minimal planning to accomplish.

Brown argues that the scam involved no more planning than a typical prison money order scam.  The Guidelines, however, do not require the government to prove that the instant offense was somehow more elaborate than comparably elaborate offenses, but rather that it involved more planning than a "simple form" offense.

6

To commit a money order scam in its "simple form," a defendant would merely obtain money orders, alter the amounts, and cash them. Since the planning required for the instant offense greatly exceeds this model, we conclude the district court did not clearly err in assessing the enhancement.[2]

*C.    Vulnerable Victims*

The district court imposed a two-point enhancement after finding that Lomoriello was an unusually vulnerable victim to this sort of fraud. The Guidelines permit this enhancement if the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct. U.S.S.G. § 3A1.1. The determination of "vulnerability is a complex fact dependent upon a number of characteristics which a trial court could not possibly articulate completely," and is certainly "not reducible to a calculation of the victim's age or to a diagnosis of the victim's disease." *United States v. Mejia-Orosco*, 868 F.2d 807, 809 (5th Cir.), *cert. denied*, 109 S.Ct. 3257 (1989). We give due deference to the district court's determination of vulnerability and of what the defendant

---

[2]    Brown also argues that he should have received a reduction in his offense level because he played a minimal or minor role in the conspiracy. This is an issue on which Brown had the burden of proof. The PSI found "no evidence to suggest that [he] was less culpable than any of the persons involved in the conspiracy." Addendum to PSI at 7. In particular, the report pointed out that his "official position was an integral factor which facilitated the commission of the offense; . . . therefore, his role could not be described as minor." *Id*. The district court adopted the PSI. Brown has not demonstrated that the district court's adoption of this aspect of the PSI was clearly erroneous or the product of legal error.

knew or should have known in this respect. *United States v. Rocha*, 916 F.2d 219, 244-45 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 2057 (1991). The PSI indicates that the Parchman scam primarily targets older women who are basically alone in life, in that they are usually widowed, elderly and have no family close at hand. Lomoriello and Fortner each fit the description of a lonely, elderly widow seeking attention and companionship through a lonely hearts pen-pal magazine; and thus, particularly susceptible to the conspirators' manipulation and deceit.

Brown contends that the enhancement should not apply because he did not know the actual victims of the scam were unusually vulnerable. He cites *United States v. Sutherland*, 955 F.2d 25 (7th Cir. 1992), for the position that a defendant must know the specific victim was unusually vulnerable rather than merely knowing that the scam targeted a particular group. This assertion misstates *Sutherland*. In *Sutherland*, the Seventh Circuit ruled that the enhancement was not warranted where the defendant conducted a mail fraud scam targeting war veterans as a group. *Id*. at 27 & n.1. The Court found that neither the victims' ages nor their status as war veterans made them unusually vulnerable because the scam targeted young Vietnam veterans as well as older veterans of World War II, and there was no indication that, as a group, war veterans are any more susceptible to fraud than the general public. *Id*. The instant case presents the exact opposite situation. Not only were the victims of the Parchman scam *specifically* chosen for their age, loneliness, and gullibility, but the district court could have reasonably concluded that lonely, elderly widows, *as a*

8

*group*, are more susceptible than the general public to this type of fraud.[3]  We conclude the district court did not err in finding the women targeted by the scam were "vulnerable victims" under section 3A1.1.  Furthermore, we have no reason to doubt that Brown, as a worker at Parchman, knew or should have known that the scam targeted this type of victim.

D.    *Abuse of Position of Public Trust*

Section 3B1.3 provides an enhancement of two offense levels "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission . . . of the offense."  U.S.S.G. § 3B1.3.  Because the application of section 3B1.1 involves a sophisticated factual determination, we must affirm the district court's conclusion unless it is clearly erroneous.  *United States v. Brown*, 941 F.2d 1300, 1304 (5th Cir.), *cert. denied* 112 S.Ct. 648 (1991).  It is axiomatic that the public places tremendous trust in prison employees that they will not conspire with inmates to violate the law.  *Id*. at 1305.  The fact that Brown's employer was a private entity that contracted its work to the prison is relevant but not

---

[3]    Brown's claim that vulnerability can not be based on a targeted group contradicts the intent of section 3A1.1.  The commentary indicates the adjustment for vulnerable victims would apply "in a fraud case where the defendant marketed an ineffective cancer cure [to cancer patients]."  § 3A1.1, comment. (n. 1).  Nowhere in this example does it state that any individual victim purchasing such a cure must be unusually vulnerable beyond the fact that he has cancer and is seeking a cure. In other words, the Guidelines deem cancer patients, as a group, to be unusually vulnerable *vis a vis* the general public to snake oil salesmen promising cancer cures.  Similarly, as a group, lonely, elderly widows could legitimately be considered unusually susceptible to frauds that prey on the companionship they miss and desire.

9

determinative.  The district court found that Brown's employment inside the prison as a food service manager afforded him the unique opportunity to interact with inmates without being scrutinized by prison officials.  Since he, unlike members of the general public, had access in and out of the penitentiary without being searched, he could easily deliver the money to the inmates in furtherance of the crime.

Brown argues that he did not occupy a position of trust because his employment at Parchman merely provided an opportunity to commit the offense.  The Application Notes explain that "[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons." U.S.S.G. § 3B1.1, comment. (n. 1).  As an example, the adjustment "would not apply to an embezzlement by an ordinary bank teller."[4] *Id*.  Unlike teller embezzlement, a position of trust is not already implicit in charges of mail fraud and money order alteration against a prison worker (see note 4).  Moreover, Brown's position is in other respects not wholly analogous to an embezzling bank teller.  As the Ninth Circuit has stated:

> "[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Hill*, 915

---

[4]    We have observed in some decisions a reluctance to broadly analogize from the so-called "bank teller exception," either limiting the scope of its application or suggesting that a teller's position of trust is already implicit in the charge of embezzlement, and thus already included in the offense level. *Brown*, 941 F.2d at 1305 n.6 (citing *United States v. Drabeck*, 905 F.2d 1304, 1306-07 (9th Cir. 1990)).

F.2d 502, 506 (9th Cir. 1990).

It has been stated that the rationale underlying the "bank teller exception" is that although the teller's position provides an opportunity to embezzle money, reasonably diligent supervisors could easily detect the wrongdoing after it has occurred. *United States v. Helton*, 953 F.2d 867, 870 (4th Cir. 1992) ("lax supervision alone does not convert one's job into a 'position of trust' under § 3B1.3."). Where the wrongdoing is smuggling money into a prison, however, there is no analogous supervision capable of detecting the completed crime. Brown's employment provided prison admittance without being searched and unsupervised access to inmatesSQfactors which were indispensable for the commission of the crime and which were unique to his employment.[5] We ultimately

---

[5] Brown argues that if his employment as a food service manager is deemed a position of public trust then all prison employees would automatically be subject to a similar sentence enhancement solely on the basis of their employment. This assertion does not accurately reflect section 3B1.3. The enhancement only applies if the district court finds the defendant (1) occupies a position of trust, and (2) has *abused* his position in a manner that *significantly* facilitated the commission or concealment of the offense. In reviewing another scheme involving Parchman employees smuggling contraband to inmates, we stated:

> "[T]he question here is not whether any other Parchman employee could have committed the offense, but rather whether Brown occupied a superior positionSQrelative to all people in a position to possess with intent to distribute heroin (*i.e.*, the general public)SQas a result of his counselor role." *Brown*, 941 F.2d at 1305.

The 1993 amendments to section 3B1.3 further support this presumption. The amended commentary declares that "because of the special nature of the United States mail an adjustment for an abuse of a position of trust will apply to *any employee* of the U.S. Postal Service who engages in the theft or destruction of undelivered United States mail." U.S.S.G. § 3B1.3, comment.

conclude that the district court did not clearly err in finding that Brown occupied a position of public trust and that he abused that position in a manner that substantially facilitated the offense.

*E.    Acceptance of Responsibility*

Brown argues that the district court should have reduced his offense level by two points for acceptance of responsibility pursuant to section 3E1.1.(a).  Factors used to determine whether the defendant has accepted responsibility include his "voluntary surrender to authorities promptly after commission of the offense [and] assistance to authorities in the recovery of the fruits . . . of the offense." U.S.S.G. § 3E1.1, comment. (n.1(d),(e)).  Brown argues that the district court should have granted a reduction for acceptance of responsibility because he voluntarily appeared at the police station, returned the uncashed money orders, and confessed his participation in the conspiracy.  However, because the district court "is in a unique position to evaluate a defendant's acceptance of responsibility.  . . . the determination of the sentencing judge is entitled to great deference on review."  U.S.S.G. § 3E1.1, comment. (n.5).  Therefore, we review the district court's decision under a standard even more deferential than a pure clear error standard.  *United States v. Watson*, 988 F.2d 544, 551 (5th Cir. 1993), *petition for cert. filed*, (July 29, 1993) (No. 93-5407).

The adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its

_____

(n.1) (effective Nov. 1, 1993) (emphasis added).

12

burden of proof at trial by denying the essential factual elements of guilt." U.S.S.G. § 3E1.1, comment. (n.2). The commentary provides an exception for "rare situations" where:

> "[A] defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial . . . to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*

This case plainly does not present one of those rare situations. The district court did not clearly err in denying a reduction for acceptance of responsibility.

II. Refusal to Dismiss Count Two

Brown asserts that the district court erred in refusing to dismiss count two (aiding and abetting mail fraud) because it required proof of the same set of operative facts as count one (conspiracy). The courts have consistently ruled that the commission of a substantive crime and a conspiracy to commit that crime are separate and distinct offenses. *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct 1180, 1182 (1946). Wharton's Rule,[6] however, prohibits conviction for both the substantive offense and conspiracy to commit that offense if the substantive offense necessarily requires the participation and cooperation of more than one person. *United States v. Payan*, 992 F.2d 1387, 1389

---

[6] Wharton's Rule states that "[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 R. Anderson, Wharton's Criminal Law and Procedure, § 89, at 191 (1957); *see generally Iannelli v. United States*, 95 S.Ct. 1284, 1288 & n.5 (1975).

13

(5th Cir. 1993).  A conviction based solely on aider and abetter liability would appear to require the involvement of at least two persons since one cannot aid and abet oneself.  Nevertheless, we have recently held that Wharton's Rule does not bar separate convictions for aiding and abetting an offense and conspiring to commit that offense.  *Id*.  The aiding and abetting statute, 18 U.S.C. § 2, does not define an offense, but simply provides that one who aids or abets the commission of a substantive offense is punishable as a principal.  *Id*. at 1390.  In applying Wharton's Rule, we consider whether "it is *impossible under any circumstances* to commit the substantive offense without cooperative action." *Id*. Clearly, a single individual acting alone is capable of committing mail fraud as defined by 18 U.S.C. § 1343.  Thus, the district court properly refused to dismiss count two.

III. Admission of Evidence:  Other Money Orders and Cash

Over the defendant's objection, the district court allowed the government to introduce evidence of other money orders sent to Lomoriello and cash mailed to Brown's address.  We review such an evidentiary ruling under an abuse of discretion standard.  *United States v. Vasquez*, 953 F.2d 176, 182 (5th Cir.), *cert. denied*, 112 S.Ct. 2288 (1992).  First, Lomoriello testified that she received a second set of money orders from Johnny Clark, again representing himself as Sims's case worker.  This time, however, Sims instructed her to transfer the money to Wanda Newman in Oxford, Mississippi, rather than to Jackie Brown.  The district court admitted the second set of money orders to show how the postal authorities were alerted to the scheme and to show that Sims wanted to continue to

14

do business with Lomoriello. The court did not elaborate further, however, on the basis for its determination. The government argues that these money orders were properly admitted under Fed.R.Evid 404(b) as evidence of other crimes, wrongs or acts used to show a common scheme initiated by the same conspirator, Sims, and directed at the same victim, Lomoriello. Essentially, the government contends Brown represented one of several "spokes" emanating from the same hub of a single conspiracy. Fortunately, our review of this matter does not require us to resolve the merits of the government's position. Were we to find the district court abused its discretion by admitting this extrinsic evidence, we would still conclude that the admission of this evidence was harmless. There is no risk that it could have improperly been used to prove Brown acted in conformity with such bad acts because Brown has already confessed his involvement in the scam. The evidence against Brown was overwhelming. His own brief states that "he immediately went to the police station and confessed to Officer Serio and then, two days later, again went voluntarily to the police station and again confessed to the postal inspector and acknowledged his participation on the witness stand . . ." and that he "confessed his guilt to Postal Inspector Collins."

The district court also permitted Josephine Fortner to testify that she had cashed money orders sent to her by Sims and had forwarded the money to Jackie Brown at an address in Cleveland, Mississippi. Brown denied ever receiving any cash from Fortner, but admitted that he lived at the Cleveland address and that he was the only Jackie Brown at that particular address. The court

15

instructed the jury that Fortner's testimony was admissible only as proof of Brown's intent, state of mind, absence of mistake, and motive or opportunity to commit the offense charged. We find that, with these instructions, the district court acted within its discretion in admitting Fortner's testimony.

IV.  Refusal to Admit Handwriting Report

Brown contends the district court erred in refusing to admit a handwriting report prepared by the government's analyst that stated Brown "could not be identified or eliminated as the writer" of the "Jackie Brown" signature on the Express Mail package receipt sent to Brown's address by Fortner.  The report stated that the signature "evidence[d] features and characteristics consistent with disguised writing and was possibly written with the writer's unaccustomed (awkward) writing hand."  Once again, we review the district court's evidentiary ruling for abuse of discretion. *Vasquez*, 953 F.2d at 182.  In this case the analyst did not testify and the government only presented evidence that Fortner was instructed to (and did) send the cash to a person by the name of Jackie Brown at an address later confirmed to be Brown's home address.  The government did *not* attempt to prove that the signature on the receipt was genuine.  Therefore, the information contained in the handwriting report was not exculpatory, and, as previously noted, the proof against Brown was overwhelming. Accordingly, any error in this respect was harmless.

V.  Admission of Brown's Written Statement

Finally, Brown asserts in passing the district court's admission of his written statement given to Inspector Collins was

16

improper because Collins failed to give him his *Miranda* warnings. This contention has not been properly raised in Brown's brief. Even it if had been, it is wholly without merit. The law is well settled that *Miranda* warnings are required only in instances of custodial interrogation by law enforcement officials. *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966). In this case, Brown was not in custody when he gave the statement. Brown voluntarily appeared at the police station, gave the statement, and left the station of his own accord. The absence of custodial interrogation made *Miranda* warnings unnecessary; thus, the district court properly admitted the statement.

## Conclusion

Brown has failed to show the district court below committed any reversible error. Accordingly, his conviction and sentence are

AFFIRMED.