GREENAWAY, JR., Circuit Judge,
concurring in part, dissenting in part,
The Sentencing Guidelines are meant to constrain judicial discretion, focusing and channeling decisions about criminal punishment in order to provide consistent, disciplined conclusions. I fear that my colleagues have shed those constraints. By disregarding the binding source of law here — the Sentencing Guidelines themselves — the majority has left the abuse of a position of public trust enhancement without limits on its scope. The Guidelines, and our consistent precedent in applying them, delineate particular sorts of abuse of trust which trigger this enhancement. The majority’s interpretation sweeps those textual and precedential distinctions away, rendering the enhancement indiscriminately applicable to a panoply of criminal actors. I am compelled to dissent.[1]
Some violations of trust — but not all— are crimes. And when they are crimes, violations of trust are sometimes — but not always — subject to increased punishment. The Sentencing Guidelines provide a two-level enhancement for defendants who *53 “abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense.” U.S.S.G. § 3B1.3. In this case, Douglas undoubtedly violated the trust placed in him by his employer, by the airport, and implicitly by the traveling public. The majority rightfully recoils at that breach. But Douglas’s crime did not abuse a position of trust, as defined by the Guidelines, and it is the Guidelines we are called upon to apply here.[2]
I begin my analysis of § 3B1.3 with the text of the Guideline and its accompanying note. The commentary to the Guidelines is authoritative and must be given “controlling weight” unless plainly erroneous or in violation of the Constitution or a federal statute. United States v. Keller, 666 F.3d 103, 108 (3d Cir. 2011) (quoting Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)). The commentary to the Guidelines are binding on federal courts and supersede even prior judicial interpretations of the Guidelines. Id. to Guidelines § 3B1.3 — worth quoting in full — provides that:
“Public or private trust” refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant’s responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client’s funds by. an attorney serving as a guardian, a bank executive’s fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.
U.S.S.G. § 3B1.3, Note 1.
The plain meaning of this Note makes clear that the sentencing enhancement is not meant to apply to cases like this one. The Sentencing Commission limited the enhancement to the abuse of positions characterized by “professional or managerial discretion.” The majority would write these terms out of the Guidelines entirely. After correctly observing that those without professional or managerial job titles can nevertheless abuse positions of trust, the majority goes further than the Guidelines allow, reducing the analysis only to whether the defendant has discretion “visa-vis the object of the wrongful act.” Maj. Op. at 47 (citing United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994)). Never again does the majority ask nor mention whether that discretion is the variety specified by the Guidelines: professional or managerial discretion. These terms modify the word “discretion” and must be given effect. See United States v. Cheape, 889 F.2d 477, 480 (3d Cir. 1989) (applying rule against superfluities to Sentencing Guidelines). Any interpretation of § 3B1.3 that provides an enhancement for discretion generally, rather than only professional or *54 managerial discretion, is broader than what the Guidelines provide.
Nor does the majority address the remainder of the Note. The Sentencing Commission further explained exactly what sort of discretion characterizes a position of trust: “substantial discretionary judgment that is ordinarily given considerable deference.” Deference is at the core of the Guidelines’ definition of a position of trust, but is nowhere to be found in this case. The paradigmatic examples of positions of trust provided for by the Sentencing Commission are characterized by this sort of deference. A patient defers to a doctor’s medical expertise and allows him to set a course of treatment; she substitutes his judgment for her own. U.S.S.G. § 3B1.3, Note 1. In “the case of an embezzlement of a client’s funds by an attorney serving as a guardian,” the client has delegated financial decisionmaking to his attorney; her embezzlement relies on that substitution of judgment. U.S.S.G. § 3B1.3, Note 1.
Who defers to Douglas’s discretionary judgments? No one. The majority asserts that Douglas’s discretion was manifest in his ability “to move freely into the terminal without inspection.” Maj. Op. at 49. But that ireedom of movement pertains to Douglas himself. He did not exercise deci-sionmaking power on behalf of others who deferred to his position or expertise. This is not the kind of discretion specified by the Guidelines.
In fact, Douglas is more akin to the “ordinary bank teller or hotel clerk” whom the Guidelines expressly specify are not covered. U.S.S.G. § 3B1.3, Note 1. A bank teller has physical access to highly sensi-five locations — cash tills, vaults, perhaps safe deposit boxes — and may be permitted to move through the bank freely, without inspection. But bank tellers are not subject to the abuse of a position of trust enhancement. Freedom of movement is a form of discretion, but it is not the managerial or professional discretion that is subject to this enhancement.
The history of § 3B1.3 only underscores the importance of these provisions. Prior to a set of 1993 amendments, Note 1 provided only that “The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.” U.S.S.G. § 3B1.3 note (Historical Notes, 1993 Amendments). The Sentencing Commission added' its discussion of “professional or managerial discretion” and of deference to the defendant’s judgment to its Commentary in 1993. These qualifications cannot be ignored, minimized, or flattened into a general discussion of abuse of trust; the Commission acted specifically to include them.[3] Cf. Stone v. I.N.S., 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) (“When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.”).
In addition to the express terms of Note 1, the provisions of Note 2 offer further reason not to apply the § 3B1.3 sentencing enhancement to Douglas. Note 2 provides that “[njotwithstanding Application Note 1 ... an adjustment under this guideline *55 shall apply to the following.” It then lists specific contexts in which physical access suffices for § 3B1.3 to apply, including cases in which postal workers engage in the theft or destruction of undelivered mail or in which defendants abuse their position to obtain identification information, as when a hospital orderly misappropriates information from a patient’s chart. § 3B1.3 Note 2. Thus, Note 2 carves out certain exceptions in which the enhancement applies where it would not otherwise. Were these low-level workers covered by the definitions in Note 1, there would be no cause to single them out separately in Note 2.
The principle of expressio unius est ex-clusio alterius instructs us that because the Sentencing Commission singled out two areas where low-level workers who abuse their physical access are subject to the enhancement — theft of mail by postal workers and identity theft — the Commission did not mean to cover other low-level employees who abuse their physical access. See United States v. Jankowski, 194 F.3d 878, 884 (8th Cir. 1999) (“the enhancement for postal employees is an exception to the general definition as stated in the first paragraph of note 1 ... the exception is limited and meant only to protect the delivery of the mail.”).
Airports may be, as the majority writes, a special and sensitive context, in which all employees are held to a higher standard. If so, the Sentencing Commission has the power to single out airport employees for coverage based only on access, just as it did postal workers. But the Sentencing Commission did not do so. The Sentencing Commission singled out postal workers.[4] It is not for the courts to impose their own substantive beliefs in place of those of the expert body tasked with preparing the Guidelines. Cf. Mistretta v. United States, 488 U.S. 361, 379, 393, 109 S.Ct. 647, 102 L.Ed.2d 714 (describing Sentencing Commission as “expert body” making “political judgment[s].”); United States v. Frank, 864 F.2d 992, 1015 (3d Cir. 1988) (comparing Commission’s “extrajudicial task of delegated substantive rulemaking” with “judicial function” of imposing sentences).
We are bound to follow the Sentencing Commission’s notes in interpreting the Guidelines. United States v. Savani, 733 F.3d 56, 62 (3d Cir. 2013) (“guidelines commentary, interpreting or explaining the application of a guideline, is binding on us when we are applying that guideline because we are obligated to adhere to the Commission’s definition”). The majority, however, barely engages with the Guidelines’ text. Rather, their analysis rests almost entirely on the judicially-created tests we have previously elaborated. I do not believe that the text of the Guidelines allows us to impose the § 3B1.3 sentencing enhancement on Douglas. If our precedent compelled such an outcome, I would conclude that our precedent needed to be brought into line with the authoritative interpretations set forth in the notes to the Guidelines. But our cases are entirely consistent with the principles set forth above — at least until now.
The majority laid out the three-part Pardo test which structures our determination of whether a defendant occupies a position of trust. United States v. Pardo, 25 F.3d 1187, 1192 (3d Cir. 1994). And the majority properly noted that this test must be applied purposively, steered by the “guiding rationale of the section — to punish ‘insiders’ who abuse their position rather than those who take advantage of an *56 available opportunity.” Id. See also United States v. DeMuro, 677 F.3d 550, 567-68 (3d Cir. 2012) (restating standard).
However, the majority failed to heed its own admonition about the section’s purpose. Indeed, at one point the majority summed up Douglas’s crime by stating that he “took advantage of his largely unfettered access at the airport to surreptitiously move contraband.” Maj. Op. at 50. While we eschew “magic words” formalisms in our analysis, it is revealing that the majority described Douglas using precisely the language that our precedent uses to describe when § 3B1.3 is inapplicable. Douglas did, in fact, only “take advantage” of an opportunity for criminality. For this reason, § 3B1.3 does not cover him.
Our jurisprudence has also consistently recognized that the § 3B1.3 sentencing enhancement only applies in the specific context laid out in the Guidelines. For example, we have described the enhancement as applying to “relationships.” DeMuro, 677 F.3d at 568 (including “a mother/daughter relationship and a babysitter/child relationship” as well as a parishioner/church advis- or relationship (citations omitted)). Positions of trust, under the Guidelines, are relational, existing between defendants and those who defer to their judgment.
Likewise, although we do not limit the enhancement to “formal” fiduciary relationships, we routinely ask whether relationships were “analogous to the fiduciary relationship” or “fiduciary-like.” United States v. Iannone, 184 F.3d 214, 225 (3d Cir. 1999). See also United States v. Bennett, 161 F.3d 171, 196 (3d Cir. 1998) (“It was this fiduciary position that Bennett occupied ... that caused the District Court to find Bennett held a position of trust relative to his victims.”); United States v. Sokolow, 91 F.3d 396, 413 (3d Cir. 1996) (“Sokolow argues that no fiduciary relationship existed with NIBA members in connection with the submission of premiums .... We disagree.”).
We have also looked specifically for professional or managerial discretion, in the particular sense provided for by the Guidelines: that clients defer to the considered judgment of the defendant, who operates outside effective supervision. See United States v. Babaria, 775 F.3d 593, 597 (3d Cir. 2014) (“there was no one supervising Dr. Babaria’s position as the medical director and manager of Orange”); United States v. Kennedy, 554 F.3d 415, 425 (3d Cir. 2009) (“Kennedy’s claim that neither Ursuline nor its clients placed special reliance upon her is specious because she was responsible for managing her clients’ finances.”) (emphasis added); United States v. Hart, 273 F.3d 363, 377 (3d Cir. 2001) (categorizing stockbrokers based on discretion to freely trade granted by their customers, and assessing § 3B1.3 applicability accordingly); Iannone, 184 F.3d at 225 (describing defendant’s managerial position); United States v. Nathan, 188 F.3d 190, 206 (3d Cir. 1999) (“Nathan held the highest position in the company”); United States v. Sherman, 160 F.3d 967, 970 (3d Cir. 1998) (finding physicians not subject to effective supervision because of “their education and training and analysis ... inherent in the profession”); Bennett, 161 F.3d at 196 (defendant “exercised unlimited managerial discretion over the organizations and their staffs”).
Indeed, the only case the majority cites with respect to the nature of professional or managerial discretion, United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002), involved a home health aide who used her influence over her elderly patient, who “appeared to rely on her judgment and integrity,” in order to fraudulently cash checks. The aide was empowered to open her patient’s mail “without supervision” *57 and was given “authority to pay bills for her.” Id. While a home health aide is not inherently trusted with professional discretion like a doctor or attorney might be, we found that this particular home health aide was given the same power to substitute her judgment for that of her ward.
Douglas’s crime displays none of the features that we have looked for in our past applications of § 3B1.3. His criminal behavior is not rooted in any particular trust-based relationship akin to doctor/patient or parent/child. He owed no fiduciary obligation to the airline, airport or public, nor even something analogous to a fiduciary obligation. He was not supposed to place any third party’s interests above his own, nor did he imply that he would do so. Rather, his obligations were those of everyone else: not to smuggle drugs. And the record does not show Douglas exercising managerial or professional discretion, whether by operating at the top of his company’s organization chart or by deploying specialized knowledge not easily second-guessed.
All our past cases comport with the text of § 3B1.3, emphasizing that the abuse of a position of trust must always involve a relationship of deference. We have never before found mere physical access, even in a restricted setting, to demonstrate a position of trust. We should not do so here.
Bearing this in mind, a proper application of the Pardo three-part test should not cover Douglas’s behavior. I agree with the majority that his ability to move through the airport with limited security screening enabled him to “commit a difficult-to-detect wrong,” the first Pardo factor. Pardo, 25 F.3d at 1192.
But Douglas lacked “authority ... vis-a-vis the object of the wrongful act.” Id. In Pardo, we observed that the defendant “had no authority over anyone or anything.” Id. Authority means more than simply the right to be somewhere. Authority, as we recognized, is exercised with respect to another, who is ordered, controlled, or affected by that authority. See Authority, Black’s Law Dictionary (10th ed. 2014) (“1. The official right or permission to act, esp. to act legally on another’s behalf ... the power delegated by a principal to an agent.”). Like Pardo, Douglas did not have authority over someone or something other than himself, even if he had certain privileges within the airport.
As for the third factor, “whether there has been reliance on the integrity of the person occupying the position,” the record offers little information. Pardo, 25 F.3d at 1192. The majority claims that we can infer that the airport and government authorities trusted Douglas because they granted him a security clearance. Maj. Op. at 49. This is tautological. If this were the test, then every cashier given access to a register would have been hired in “reliance on [his]1 integrity.” All employers must trust their employees to some extent; the third Pardo factor asks how and why that trust is manifested. Properly understood, this third factor contrasts those who can be trusted due to their independent professional obligations or their own personal virtues from those who can only be trusted if supervised or regulated. Cf. Iannone, 184 F.3d at 225 (finding third factor met because victims relied on “resume listing years of experience,” “posing as a decorated Vietnam veteran,” and “perceived integrity as owner and CEO.”); Sherman, 160 F.3d at 970 (“[T]he insurance company relied on the integrity of Sherman as a doctor holding a medical license.”).
As the majority admits, the record simply does not disclose what supervision Douglas received as a mechanic — nor does it demonstrate what factors secured Douglas his access to the airport. This is insufficient to determine whether he was trusted *58 because of his integrity, or simply because an airline has no option other than to trust someone to fix their aircrafts.[5] The third Pardo factor, therefore, cannot support the application of the § 3B1.3 sentencing enhancement.
The experience of other courts of appeals supports this conclusion. As the D.C. Circuit has stated, Douglas “may have occupied a position of trust in the colloquial sense that [he] was trusted not to use [his] access for nefarious purposes; in that sense, so is every bank teller who has access to the bank’s money and every janitor who cleans an office where desk drawers are left unlocked.” United States v. Tann, 532 F.3d 868, 875 (D.C. Cir. 2008). See also United States v. Edwards, 325 F.3d 1184, 1187 (10th Cir. 2003) (“the fact that Ms. Edwards was trusted by her employer with significant responsibility — even to the point of allowing her to bypass usual accounting controls and pick up customer checks from incoming mail — is not determinative.”).
The majority distinguishes Tann based upon “the public safety dimension” of airport employment, “the nature of the access he had, and how he used it.” Maj. Op. at 48 n.6. Put simply, they assert that airports are special, such that physical access across' an airport per se converts a job into a position of public trust. Without minimizing the importance of airport security, I cannot agree. There is simply no limiting principle.
As noted by the majority, airport security took on new significance in the wake of the September 11 attacks, the deadliest terrorist incident in American history. The second deadliest terrorist attack was the Oklahoma City bombing, which took place at a federal office building. Associated Press, Service Held to Mark 20 Years since Oklahoma City Bombing, Chi. Tribune, Apr. 19, 2015. Are we to hold that anyone with security access to a large office building — say a janitor trafficking in drugs in the building’s basement — also holds a position of trust? What about those with access to subway systems, nightclubs, hotels, or schools — all sites of recent mass violence? Deciding that certain large facilities are so important that everyone in them holds a position of trust is a policy determination, one properly left to the Sentencing Commission or Congress. As already noted, the Commission has singled out certain institutions as per se involving the public trust — most notably the mail— and airports are not among them.
The only reasoned opinions addressing whether access to secured areas of an airport makes a position one of public trust, both from the First Circuit, have found that airport employment must be subjected to the same “professional or managerial discretion” analysis as any other job. United States v. Parrilla Roman, 485 F.3d 185, 190-91 (1st Cir. 2007) (involving airport baggage handlers who helped smuggle drugs); United States v. Correy, 570 F.3d 373, 395 (1st Cir. 2009) (involving airport janitor who helped smuggle drugs). The majority suggests that the First Circuit’s approach to § 3B1.3 diverges so greatly from our own that these cases are entirely inapposite. I am unpersuaded.[6] But regardless of the *59 differences or similarities between our tests, the First Circuit opinions have at least some persuasive power, for at the end of the day, they interpret the same Guideline.
The First Circuit looked to see whether the defendants could establish policies or supervise co-workers and whether they were in fact unsupervised. Parrilla Roman, 485 F.3d at 192. The First Circuit hewed to the instructions of the Guidelines and focused on professional and managerial discretion; the majority here fails entirely to engage with these issues. Likewise, the First Circuit properly distinguished between mere physical access — the same privileges enjoyed by bank tellers — and authority. As they held, “the security clearance awarded to [defendant] cannot transmogrify a menial position into a position of trust.” Id. at 191.
The other airport cases cited by the majority do not carry any persuasive weight as to whether § 3B1.8 applies to anyone abusing their security access to an airport. The Second Circuit expressly declined to consider “whether a § 3B1.3 enhancement was further warranted by Roberts’s abuse of a position of public trust, specifically, his abuse of access to restricted airport areas, a trust conferred by federal CBP [Customs and Border Patrol] authorities, to facilitate his drug trafficking scheme.” United States v. Roberts, 660 F.3d 149, 165 n.6 (2d Cir. 2011). As the majority correctly notes, the enhancement was applied to Roberts on the basis of his abuse of the private trust imparted to him by the airline. He served in a managerial position, assigning employees under his supervision to load airplanes. He used this managerial power to further his drug trafficking operation by assigning those who were part of the scheme to unload airplanes with drugs and keeping away those who were not in on the operation. Roberts, 660 F.3d at 153-54. This supervisory role serves as a valuable contrast to Douglas’s case, where no such managerial powers were employed.
The Ninth Circuit has upheld the application of § 3B1.3 to an airline customer service representative who, to further a drug conspiracy, “used his position with the airline to ‘gain entry into areas where others could not.’ ” United States v. Higa, 55 F.3d 448, 453 (9th Cir. 1995). But the Ninth Circuit did not seriously engage with this question; its cursory treatment was focused on whether the defendant’s acquittal on two counts precluded the application of § 3B1.3 on two other offenses. Id. Unlike the First Circuit’s analysis, which engages with the substance of the Guidelines, Higa lacks any power to persuade on this issue.
In support of its contention that certain institutions are so sensitive that anyone with access can be found to be in a position of trust with respect to the general public, the majority cites a trio of cases — all from outside this circuit — concerning prison staff. These involve a drug counselor who attempted to buy cocaine from his counse-lee, United States v. Gilliam, 315 F.3d 614 (6th Cir. 2003); a food manager who participated in a scheme to alter money orders, United States v. Brown, 7 F.3d 1155 (5th Cir. 1993); and a prison instructor who *60 conspired with inmates to manufacture and pass counterfeit bills, United States v. Armstrong, 992 F.2d 171 (8th Cir. 1993).
As the .majority observes, these cases do appear to carve out a special status for prisons, based on the public’s “right to expect and trust that those in the employ of the government for the purpose of rehabilitating criminals will refrain from entering into the kind of criminal enterprises that necessitated such rehabilitation in the first place.” Gilliam, 315 F.3d at 619. This is true as far as it goes. Other courts (not ours) have found that one context (not airports) should be treated specially under § 3B1.3.
But our sister circuits are far from uniform in their application of § 3B1.3 to prison staff. The Ninth Circuit, for example, rejected the application of § 3B1.3 to a prison cook who enjoyed access to inmates without being required to be thoroughly searched upon entry. United States v. Contreras, 581 F.3d 1163, 1168-69 (9th Cir. 2009), opinion adopted in part, vacated in part, 593 F.3d 1135 (9th Cir. 2010) (en banc). The Eleventh Circuit decided likewise in another case involving a food service worker granted access to the prison without searches, observing that a contrary reading would “extend to virtually every employment situation because employers ‘trust’ their employees.” United States v. Long, 122 F.3d 1360, 1365-66 (11th Cir. 1997).
Moreover, the grounds on which prisons have been singled out do not extend to airports. The Gilliam counselor was supposed to help inmates avoid drug abuse; instead, he recruited them into a trafficking scheme. Gilliam, 315 F.3d at 617. He violated his specific duties to the public and those under his care. In contrast, airline mechanics have no greater obligation to prevent drug smuggling than anyone else. In Armstrong, the court analogized correctional officials to police officers, on whom abuse of trust enhancements are routinely and easily applied. 992 F.2d at 173. Cf. United States v. Brann, 990 F.2d 98, 103 (3d Cir. 1993) (“Needless to say, a police officer occupies a position of public trust, and the commission of a crime by a police officer constitutes an abuse of that trust ...” (internal citations omitted)). Does it behoove us to equate airline mechanics with law enforcement officers in our jurisprudence?
It is also well-established that prisons are a “unique context.” Johnson v. California, 543 U.S. 499, 541, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (Thomas, J., dissenting); see also Burns v. Pa. Dep’t of Corr., 642 F.3d 163, 173 (3d Cir. 2011) (discussing “unique institutional concerns that arise in the prison setting”). The fact that some courts have taken prisons out from the ordinary § 3B1.3 analysis does not mean that we should single out airports.
I cannot take fault with the majority’s conviction that Douglas violated the trust placed in him by the traveling public. An airplane mechanic’s ability to walk contraband onto a commercial flight threatens the confidence we each try to maintain in the security of our aviation system. But not every violation of trust, in that everyday sense, triggers the sentencing enhancement of § 3B1.3. The Sentencing Commission has specified that only certain acts — those violating positions of trust characterized by professional or managerial discretion and by deference to the defendant’s judgment rather than abuse of his access — qualify. Douglas’s acts do not.
I am compelled to dissent because the majority’s departure from both the Guidelines and our own precedent leaves us without any principled limitation on the scope of § 3B1.3. Under the majority’s approach, I see no way to restrict § 3B1.3 to airport employees using their security *61 access to commit crimes but not to workers at other facilities with areas off-limits to the general public. The Guidelines do not warrant, or permit, such an expansion, and its commentary is binding upon us. I respectfully dissent.

. I join Parts I, II.A, and II.C of the majority opinion.

. This conduct could, of course, be considered as part of the sentencing court's analysis under 18 U.S.C. § 3553(a).

. Other courts have recognized that the specific addition of these terms "places a significant limit on the types of positions subject to the abuse-of-trust enhancement,” even compared to the pre-1993 version of the statute. United States v. West, 56 F.3d 216, 220 (D.C. Cir. 1995). See also United States v. Contreras, 581 F.3d 1163, 1166 (9th Cir. 2009), opinion adopted in part, vacated in part, 593 F.3d 1135 (9th Cir. 2010) (en banc) (comparing pre- and post-amendment tests).

. Identity theft was added in 2005 amendments, in response to a new statutory mandate. U.S.S.G. § 3B1.3 note (Historical Notes, 2005 Amendments). See Identity Theft Penalty Enhancement Act, Pub. L. 108-275, 118 Stat. 831 (2004).

. ' Of course, this analysis would be entirely different had Douglas used his expertise as a mechanic to somehow purposefully damage or endanger the safety or integrity of an aircraft. Such a circumstance might more logically be denoted an abuse of a position of trust pursuant to the Guidelines.

. According to the majority, the First Circuit uses a "two-step process" that asks first the "status question” of whether the defendant's position was characterized by professional or managerial discretion and only then asks the "conduct question” of whether that position was abused. Parrilla Roman, 485 F.3d at 190- *59 91. But our own Court has held that "[i]n applying § 3B1.3, a court must initially determine whether the defendant occupied a position of public or private trust. If he did occupy such a position, then the court must determine whether the defendant abused this position of trust in a way that significantly facilitated his crime.” Iannone, 184 F.3d at 222. If our two-step inquiry is distinct from that of the First Circuit, it is a distinction without any substantial difference. Certainly, our tests are similar enough that we can learn from the First Circuit’s reasoning.